**UNITED STATES  DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **BYRON DAVIS** | **CIVIL ACTION** |
| **VERSUS** | **NO.  14-1508** |
| **N. BURL CAIN** | **SECTION: "H"(5)** |

## REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing. *See* 28 U.S.C. § 2254(e)(2).  For the following reasons, **IT IS RECOMMENDED** that the petition for *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.[1]

I.  *Factual and Procedural History*

Petitioner, Byron Davis, is a state prisoner incarcerated in the Louisiana State Penitentiary, in Angola, Louisiana.  Davis was indicted for aggravated rape of a minor under

---

[1]  Under 28 U.S.C. § 2254(e)(2), an evidentiary hearing is held only when the petitioner shows either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, or that the claim relies on a factual basis that could not have been previously discovered by the exercise of due diligence and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner.

the age of thirteen.[2]  On May 10, 2010, following a five-day jury trial, he was found guilty as

charged.  The relevant facts as adduced at trial and relied upon by the Louisiana Fourth Circuit

on direct appeal established the following:

> On October 5, 2007, the defendant resided with his brother Carnis Davis; his
> sister-in-law, Danchel Davis; and his four minor nephews at 507 South Scott
> Street. At approximately 4:00 or 5:00 p.m., the eleven year old victim, K.R.,
> daughter of Danchel's friend Y.R. and godsister to one of the Davis children,
> went to the Davis house to help Danchel with her four sons. Later, after putting
> her sons and K.R. to bed, Carnis and Danchel Davis left the house. When the
> couple left, the defendant was resting in his room in the rear of the house; K.R.
> was in bed watching television in the middle room of the house with the Davis'
> four sons. Subsequently, the defendant entered the middle room and told K.R.
> to follow him into his bedroom. Initially, K.R. ignored the defendant's request.
> The defendant then jerked her up by the hand; K.R. followed the defendant to
> his bedroom at which time the defendant closed the door, exposed himself to
> K.R., and threatened to kill her if she told anyone. He then pulled K.R.'s pants
> and underwear down and forced her face down onto his bed. The defendant
> then told K. R., "I'm going to take [sic] care you. I'm going to take [sic] care you."
> The defendant climbed on top of K.R. and attempted to penetrate her anally. K.R.
> testified that the defendant "put his private in me."  K.R. began to cry. The
> defendant then told her to leave his bedroom; K.R. returned to the middle
> bedroom. Shortly thereafter, the defendant again took K.R. into his bedroom and
> proceeded to expose himself again. He pulled K.R.'s pants down and penetrated
> her anally. Again, she began to cry and again, he ordered her to get out of his
> room. K.R. ran into the bathroom to use the toilet. During questioning, K.R.
> correctly identified the defendant's "private" as his "penis." K.R. stated that she
> did not tell anyone about all of the details of the assault because she was scared
> that the defendant would harm her.
>
> Approximately thirty to forty-five minutes later, Carnis and Danchel Davis
> returned home. Danchel noticed that K.R. was not asleep in the middle bedroom
> and felt that something was not right. She observed the defendant standing in
> his room with his head down. Danchel began to search for K.R. As Danchel

---

[2] State Rec., Vol. 1 of 5, Orleans Parish Grand Jury Indictment.

walked into the bathroom K.R. became startled as the door opened. K.R., who appeared frightened, scared and shaken, told Danchel that she "jumped" because she thought that the defendant was coming back to get her again. Danchel twice questioned K.R. as to what was wrong. K.R. responded, "Please, I don't want [sic] be in trouble. I don't want [sic] be in trouble, Please." Danchel repeatedly questioned K.R. as to what was wrong. She assured K.R. that she was not in trouble, and the two went into the living room for privacy. K.R. told Danchel that the defendant tried to rape her. Danchel asked K.R. if she understood what she was saying and if she knew the seriousness of what she was saying. K.R. was adamant that the defendant tried to rape her. Danchel called Carnis into the living room. Danchel testified that she asked K.R. to repeat what she had told her. K.R. testified that she told Carnis that the defendant tried to rape her. Carnis testified that K.R. only told him that the defendant touched her hand; he was not told that the defendant tried to rape K.R. On cross-examination, Carnis admitted that because K.R.'s allegations involved his brother that he never wanted to get involved in the case. Danchel and K.R. went into the bathroom to check for signs of intercourse. No blood or other fluids were found on K.R.'s underwear or on the tissue she used to wipe herself.

Carnis Davis summoned the defendant into the living room. Danchel and K.R. were present. Danchel told K.R. to look the defendant in the face and confront him about what she said that he did to her. K.R., still visibly shaken, told the defendant that he tried to rape her while Carnis and Danchel Davis were gone from the house. The defendant denied the accusation and accused K.R. of lying. However, K.R. insisted that the defendant tried to rape her. Danchel put K.R. back to bed and ordered the defendant to leave her house.

Not knowing exactly how to handle the situation, and because Y.R. was having a baby shower for her sister the following day, Danchel decided not to immediately inform Y.R. of what K.R. accused the defendant of doing to her. Danchel was concerned that the accusation would ruin the baby shower and cause trauma to Y.R.'s sister.

On the morning of October 7, 2010, Danchel asked Y.R. to come to her house because she had something urgent to tell her. Danchel informed Y.R. of K.R.'s accusations against the defendant. Y.R. was visibly shaken and distraught. Carnis Davis called the defendant and asked him to come to the house to speak to Y.R. but the defendant never arrived. Subsequently, Danchel, Carnis, Y.R. and K.R.'s grandmother discussed the incident with K.R. K.R. again told them that the

defendant tried to rape her; the police were contacted.

Detective Lietreian Johns, of the Child Abuse Sex Crimes unit, was assigned to investigate the case. Upon arrival at the Davis home, Detective Johns was met by Y.R. and Danchel who informed her that K.R. told them that the defendant tried to put his penis inside her "butt." Danchel told Detective Johns that K.R. told her that she began to cry when the defendant tried to put his penis in her "butt" and that the defendant ordered her to leave his room. Danchel also informed Detective Johns that when confronted, the defendant denied K.R.'s accusations. Detective Johns testified that when she asked K.R. if the defendant exposed himself to her, K.R. answered, "Yes." Detective Johns referred K.R. to the Children's Advocacy Center and Children's Hospital.

Ahna Patterson, a forensic interviewer with the Children's Advocacy Center, conducted a taped interview of K.R. on October 10, 2010. The taped interview was played for the jury. Patterson testified that it is common for child rape victims to report additional information to her or to a doctor, and that they often report various aspects of the sexual assault to different people. K .R. told Patterson that the defendant tried to rape her. K.R. never reported to Patterson that either vaginal or anal penetration had occurred. K.R. testified that all she could think about during the interview was that the defendant had threatened to kill her if she told anyone about the incident.

Approximately two weeks after the incident K.R. began to feel ill. She experienced fever, vomiting, loss of appetite and itching in the genital area. Y.R. brought K.R. to see her primary care physician. K.R. testified that following the doctor's examination, she told her mother, "Ma, I have something to tell you." She said, "What?" I said, "I know you're going to be mad but I have to tell you this." And she said, "What it is?" I said, "He really did rape me."

On October 27, 2010, Detective Johns met with K.R. and Y.R. Detective Johns presented a photograph of the defendant to K.R. K.R. confirmed that the defendant was the person who sexually assaulted her. On November 1, 2007, Detective Johns met with K.R. and Y.R. for a third time. During this interview, K.R. told Detective Johns that the defendant raped her. Detective Johns then scheduled an appointment for K.R. to be examined by a physician at Children's Hospital.

On November 9, 2007, Dr. Adrienne Atzemis, a child abuse pediatrician at

4

Children's Hospital, conducted a comprehensive examination of K.R. at an outpatient clinic. Dr. Atzemis testified that her physical examination of K.R. revealed multiple condalomitas growths on K.R.'s vaginal lips and around her anus. These growths indicated that K.R. had genital warts which are caused by the human papillomavirus (HPV). Dr. Atzemis also observed white plaques adhered to K.R. vagina. Dr. Atzemis testified that she did not observe trauma to K.R.'s anus or vagina but stated that, because the tissue in these areas is designed by nature to stretch, the absence of trauma does not indicate that sexual penetration did not occur. Dr. Atzemis stated that a majority of victims of sexual assaults of the anus do not sustain physical trauma due to the elasticity of the skin. Even if a tear would occur, it would heal very quickly. Dr. Atzemis opined, that even if K.R. had been raped, it would be possible that she would not display visible injuries. Dr. Atzemis stated that although genital warts can be contracted in various ways, it was more likely than not that K.R.'s genital warts were the result of sexual activity.

On cross-examination, Dr. Atzemis testified that K.R. initially told her that the defendant touched her behind and denied that anyone touched her private part and put anything inside her private part. Dr. Atzemis's interview with K.R. was recorded and played for the jury. The taped conversation reflects a detailed history of sexual abuse of K.R. by the defendant which describes penile and anal contact.

Dr. Michael Heard, a pediatric gynecologist, testified for the defense. Dr. Heard opined that K.R. already suffered from genital warts prior to the alleged assault by the defendant. After reviewing all of K.R.'s medical records, Dr. Heard concluded, that K.R.'s genital warts resulted from an ongoing HPV infection that pre-dated October 5, 2007.

The defendant denied raping or trying to rape K.R. He also denied that he inappropriately touched K.R. He testified that on October 5, 2007, he returned home from work. The Davis children and K.R. were at home alone. They told him that Danchel and Carnis had left the house. While he was changing his clothes in his bedroom, K.R. entered the room. She informed him that the other children were asleep. He told her to leave and to go to bed. Within minutes K.R. entered the defendant's room a second time. She stood in the doorway looking at him as he pulled up his pants. The defendant stated that he ordered her to leave, which she did. He testified that he fell asleep until Carnis woke him up and told him to come into the living room because he was being accused of something

serious. He stated that Carnis asked him if he touched K.R.'s hand. He denied touching her hand. He denied that he was ordered to leave the house and said that he freely left on his own. He testified that later he returned to the Davis home and went to sleep. The following morning he went to work. Later, Danchel telephoned his workplace and asked him to speak to Y.R. He testified that he once again denied touching K.R. The defendant stated that he did not have a sexually transmitted disease.

Keyotta Melton, the defendant's niece, testified for the defense. She stated that she has known the defendant all of her life and that he has never displayed any behavior that would make her afraid to leave him alone with her children.[3]

On June 18, 2010, Davis was sentenced to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence.[4] His motion for reconsideration of the sentence was denied.

Davis' conviction and sentence were affirmed on December 2, 2011.[5] The Louisiana Fourth Circuit Court of Appeal rejected his arguments that the evidence was insufficient to support his conviction and that the trial court's unconstitutional jury instruction allowed conviction by a non-unanimous jury verdict. The Louisiana Supreme Court denied his related writ application without assigning additional reasons on April 13, 2012.[6]

Davis filed his first post-conviction relief application with the state district court on or

---

[3] *State v. Davis*, 2011-KA-0288 (La. App. 4th Cir. 12/2/11), 81 So.3d 1018 (Table) (Text available at 2011 WL 9160402, at * 1-4) (State Rec., Vol. 1 of 5).

[4] State Rec., Vol. 1 of 5, Minute entry of June 18, 2010; see also Sentencing Order.

[5] *State v. Davis*, 2011-KA-0288 (La. App. 4th Cir. 12/2/11), 81 So.3d 1018 (Table)

[6] *State v. Davis*, 2012-KO-0005 (La. 4/13/12), 85 So.3d 1247; State Rec., Vol. 1 of 5.

about August 23, 2012.[7]  In that application, he raised only claims of ineffective assistance of trial and appellate counsel.  The state district court denied the claims on the merits on October 23, 2012.[8]  The Louisiana Fourth Circuit Court of Appeal denied relief on December 7, 2012.[9] The Louisiana Supreme Court denied relief on June 21, 2013.[10]

Davis filed a second post-conviction relief application with the state district court on or about June 26, 2013.[11]  He raised two claims for relief:  (1) he was denied the opportunity to establish his innocence because the State withheld the victim's school medical records in violation of *Brady v. Maryland*; and (2) his attorney rendered ineffective assistance in failing to investigate and use the school records at trial. The state district court denied relief on July

---

[7] State Rec., Vol. 5 of 5, Uniform Application for Post-Conviction Relief.  Federal *habeas* courts must apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court filing, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system."  *Causey v. Cain*, 450 F.3d 601, 607 (5th Cir. 2006).  If that date cannot be gleaned from the state court record with respect to the filing, this Court will use the signature date of the applications as the filing date, in that the various applications were obviously placed in the mail no earlier than the date they were signed. In those instances where no signature date appears on a document and no other evidence is available, the Court will look to the file-stamp placed on the document by the clerk of court. Davis signed the application on August 23, 2012.

[8] State Rec., Vol. 5 of 5, District Court Judgment denying PCR, No. 475-618 "F"(Oct. 23, 2012).

[9] *Id.*, *State v. Davis*, 2012-K-1645 (La. App. 4th Cir. December 7, 2012) (unpublished writ ruling).

[10] *Id.*, *State ex. rel. Byron Davis v. State*, 2013-KH-0144 (La. 6/21/13), 118 So.3d 409.

[11] *Id.*, Uniform Application for Post-Conviction Relief signed June 26, 2013.

24, 2013.[12]  The Louisiana Fourth Circuit Court of Appeal denied his related writ application

on September 20, 2013.[13]  The Louisiana Supreme Court denied relief on May 30, 2014.[14]

On June 24, 2014, Davis filed his federal application for *habeas corpus* relief. In his

application, Davis alleges: (1) the evidence adduced at trial was legally insufficient to sustain

his conviction; (2) his conviction by a non-unanimous jury verdict was unconstitutional; (3)

the State withheld the victim's school medical records in violation of *Brady v. Maryland*; and

(4) counsel rendered ineffective assistance in failing to investigate and use the victim's school

medical records at trial.[15]

The State filed a response conceding that the federal application is timely, and that with

the exception of his *Brady* claim, he has exhausted state court remedies.  With regard to the

*Brady* claim, the State argues it may be dismissed as unexhausted and procedurally defaulted

or alternatively on the merits.

---

[12] *Id.*, State District Court Judgment denying PCR, No. 475-618 "F" (July 24, 2013).

[13] *Id.*, *State v. Davis*, 2013-K-1184 (La. App. 4th Cir. Sep. 20, 2013) (unpublished writ ruling).

[14] *State ex. rel. Byron Davis v. State*, 2013-KH-2533 (La. 5/30/14), 140 So.3d 1170.

[15] Rec. Doc. No. 6, Petition. "A prisoner's *habeas* application is considered 'filed' when delivered to the prison authorities for mailing to the district court."  *Roberts v. Cockrell*, 319 F.3d 690, 691 n.2 (5th Cir. 2003). The record reflects that he delivered his petition to officials for mailing at the earliest on June 24, 2014.  Rec. Doc. 6, p. 37.

II.  *Standards of Review*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both. The amendments "modified a federal *habeas* court's role in reviewing state prisoner applications in order to prevent federal *habeas* 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of *habeas corpus* by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law or mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have

9

held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." *Bell*, 535 U.S. at 694.

A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the United States Supreme Court's cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of the United States Supreme Court and nevertheless arrives at a result different from United States Supreme Court precedent. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000); *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir.), *cert. denied*, 131 S.Ct. 294 (2010). An "unreasonable application" of [United States Supreme Court] precedent occurs when a state court "identifies the correct governing legal rule... but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407-08; *White v. Woodall*, 134 S.Ct. 1697, 1706 (2014).

It is well-established that "an unreasonable application is different from an incorrect one." *Bell*, 535 U.S. at 694. A state court's merely incorrect application of Supreme Court precedent does not warrant *habeas* relief. *Puckett v. Epps*, 641 F.3d 657, 663 (5th Cir.2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable" under the AEDPA." *Harrington v. Richter*, 562 U.S. 86 (2011). Section 2254(d) preserves authority to issue the writ in cases where there is "*no possibility*

10

fairminded jurists could disagree that the state court's decision conflicts with [United States Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. at 102; emphasis added); *see also Renico v. Lett*, 559 U.S. 766, 130 S.Ct. 1855, 1866 (2010) ("AEDPA prevents defendants—and federal courts—from using federal *habeas corpus* review as a vehicle to second-guess the reasonable decisions of state courts.").

III. *Petitioner's Claims*

(a) *Sufficiency of the evidence*

Davis claims that there was insufficient evidence to support his conviction for aggravated rape. He argues that the physical evidence not only fails to corroborate the victim's testimony, but proves that he did not rape the victim. He also contends the victim's testimony was not credible because she reported differing versions of the events to various individuals following the rape. Applying the appropriate legal standard under *Jackson v. Virginia*, 443 U.S. 307 (1979), the Louisiana Fourth Circuit Court of Appeal denied this claim on direct review as follows:

> In his first assignment of error, the defendant asserts that the evidence is insufficient to support his conviction. Specifically, he argues that there was no physical evidence to support K.R.'s allegation of rape and K.R.'s testimony was not credible because she reported "multiple versions" of the alleged rape.
>
> Aggravated rape is defined, in pertinent part, as follows:
>
> > Aggravated rape is a rape committed upon a person sixty-five years of age or older or where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following

11

circumstance:

(4) When the victim is under the age of thirteen years. Lack of knowledge of the victim's age shall not be a defense.

La. R.S. 14:42A(4).

When reviewing the sufficiency of the evidence to support a conviction, this court is controlled by the standard set forth by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), which dictates that to affirm a conviction "the appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." *State v. Captville*, 448 So.2d 676, 678 (La.1984). In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. *State v. Robinson*, 2002–1869, p. 16 (La.4/14/04), 874 So.2d 66, 79; *State v. Jones*, 97–2591, p. 7 (La. App. 4 Cir. 9/8/99), 744 So.2d 165, 169. Under the *Jackson* standard, the rational credibility determinations of the trier of fact are not to be second guessed by a reviewing court. *State v. Juluke*, 98–341 (La.1/8/99), 725 So.2d 1291, 1293. "[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." *State v. Smith*, 600 So.2d 1319, 1324 (La.1992).

In the instant case, the defendant's argument that K.R. reported multiple versions of the incident with the defendant is not supported by the record. K.R. testified that she failed to report that the defendant raped her out of fear that he would carry out his threat to kill her. When Danchel Davis discovered K.R. in the bathroom, she described K.R. as scared, shaken and frightened to the point where K.R. became startled when Danchel opened the door because K.R. believed that it was the defendant coming for her again. It took repeated attempts by Danchel to elicit from K.R. what had happened. At that time K.R. said that the defendant tried to rape her. Later, after approximately one month, K.R. finally admitted to her mother, in her primary care physician's office, that the defendant actually raped her. Furthermore, Ahna Patterson testified that it is not uncommon for child rape victims to report additional information to her or to a doctor, and that they often report various aspects of the sexual assault to different people. In addition, K.R's recorded interview with Dr. Adrienne

12

Atzemis was played for the jury. K.R. described both penile and anal contact with defendant. The jury observed K.R.'s demeanor on the witness stand and determined that K.R. and the other state witnesses were credible.

Dr. Atzemis also testified that the lack of physical trauma does not negate penetration. Dr. Atzemis testified that the lack of physical evidence was not inconsistent with K.R.'s allegation of rape because a majority of victims of sexual assaults of the anus do not sustain physical trauma due to the elasticity of the skin. Even if a tear would occur, it would heal very quickly. Dr. Atzemis opined, that even if K.R. had been raped, it would be possible that she would not display visible injuries. Dr. Atzemis stated that although genital warts can be contracted in various ways, it was more likely than not that K.R.'s genital warts were the result of sexual activity. Thus, the evidence was sufficient for the jury to conclude that defendant raped K.R.[16]

The Louisiana Supreme Court denied Davis' related writ application without assigning additional reasons.[17]

The Supreme Court set forth the standard for analyzing constitutional challenges to the sufficiency of the evidence in *Jackson v. Virginia*, 443 U.S. 307 (1979), holding that "the relevant question is whether,  after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt."  *Id*. at 319; *see also Williams v. Cain*, 408 F. App'x 817, 821 (5th Cir.2011); *Perez v. Cain*, 529 F.3d 588, 594 (5th Cir. 2008). "The *Jackson* inquiry 'does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit.'" *Santellan v. Cockrell*, 271

---

[16] *State v. Davis*, 2011-0288, 2011 WL 9160402, at *4-5.

[17] *State v. Davis*, 2012-0005 (La. 4/13/12), 85 So.3d 1247.

F.3d 190, 193 (5th Cir.2001) (*quoting Herrera v. Collins*, 506 U .S. 390, 402 (1993)).

Notably, review of the sufficiency of the evidence does not include review of the weight of the evidence or the credibility of the witnesses, because those determinations are within the exclusive province of the jury. *United States v. Young*, 107 F. App'x 442, 443 (5th Cir.2004) (*citing United States v. Garcia*, 995 F.2d 556, 561 (5th Cir.1993)); *see Jackson*, 443 U.S. at 319 (noting that it is the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts").  A federal *habeas* court is not authorized to substitute its interpretation of the evidence or its view of the credibility of witnesses in place of the fact-finder. *Weeks v. Scott*, 55 F.3d 1059, 1062 (5th Cir.1995); *Alexander v. McCotter*, 775 F.2d 595, 598 (5th Cir.1985).  Thus, all credibility choices and conflicting inferences must be resolved in favor of the verdict. *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir.2005).

Because a sufficiency of the evidence claim presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting petitioner's claim unless he shows that the decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Perez v. Cain*, 529 F.3d at 594.  Moreover, because the state court's decision applying the already deferential *Jackson* standard must be assessed here under the strict and narrow standards of review mandated by the AEDPA, the standard to be applied by this Court is in fact "twice-deferential." *Parker v. Matthews*, 132 S.Ct. 2148, 2152 (2012); *see also Coleman*

14

*v. Johnson*, 132 S.Ct. 2060, 2062 (2012).

In the instant case, the elements of the crime were established through the victim's testimony. Generally, a victim's testimony alone is sufficient to support a conviction. *Peters v. Whitley*, 942 F.2d 937, 941–42 (5th Cir.1991); *see also Fetterley v. Whitley*, No. 94–30310, 1994 WL 708655, at *1 n. 6 (5th Cir. Dec. 6, 1994); *Holderfield v. Jones*, 903 F.Supp. 1011, 1017 (E.D. La. 1995). Davis argues that the absence of any physical manifestation of sexual activity necessarily negates the victim's testimony. The jury obviously discounted the absence of physical signs of sexual abuse in light of the victim's compelling testimony, her account of the incident as related to medical professionals and family members and Dr. Atzemis' testimony that it is not at all uncommon for there to be no physical manifestation of trauma as a result of the encounter described by the victim. Given this evidence, a rational trier of fact could have concluded beyond a reasonable doubt that Davis committed the aggravated rape.

Essentially, Davis argues that the jury should have given less weight to the victim's testimony and determined that her account of the incident was not credible based on two factors: the opinion offered by defense medical expert, Dr. Heard, that the victim had a preexisting human papillomavirus (HPV) infection and suffered from genital warts before the assault based on his review of photographs, and the victim's alleged inconsistent accounts of the incident. Dr. Atzemis, who personally examined the victim after the rape, testified that no such conclusive clinical determination could be made with regard to the victim's HPV

15

infection.[18]  She testified extensively regarding the human papillomavirus and the victim's

condition, and Dr. Atzemis' testimony, if credited, plainly supported the jury's verdict of guilt.

It was certainly within the province of the jury to give more weight to the testimony of one

medical expert over another.  Furthermore, the court of appeal rejected Davis' argument that

the victim offered multiple inconsistent versions of the incident.  Although the victim's details

of the incident evolved over time — as evidence adduced showed is typical of young rape

victims — she did not waver in her account that she was indeed sexually assaulted by Davis.

Moreover, although Davis disputes the credibility of the victim, witness credibility is an issue

for the jury, not a federal *habeas* court. Where a petitioner's insufficient evidence claim is

based on the credibility of a witness, a federal *habeas* court generally will not grant relief. *See*

*Schlup v. Delo*, 513 U.S. 298, 330 (1995) ("[U]nder *Jackson*, the assessment of the credibility of

witnesses is generally beyond the scope of review."); *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th

Cir.2005) ("All credibility choices and conflicting inferences are to be resolved in favor of the

verdict."); *McCowin v. Scott*, No. 93–5340, 1994 WL 242581, at *2 (5th Cir. May 26, 1994) (A

"challenge of the jury's credibility choice fails to satisfy the *Jackson* standard for habeas

relief."); *Phillips v. Cain*, Civ. Action No. 11–2725, 2012 WL 2564926, at *14 (E.D.La. Apr. 11,

2012), *adopted*, 2012 WL 2565025 (E.D.La. July 2, 2012); *Picou v. Cain*, Civ. Action No.

06–6258, 2007 WL 1521021, at *5 (E.D.La. May 22, 2007).  This Court may not conduct its own

---

[18] State Rec., Vol. 2 of 5, Trial Transcript (Dr. Atzemis), p. 84; see also State Rec., Vol. 4 of 5, Trial Transcript, p. 181.

assessment of the evidence.

For the reasons noted by the state court, the evidence presented in the instant case, viewed in the light most favorable to the prosecution, was sufficient for any rational trier of fact to find Davis guilty beyond a reasonable doubt. Therefore, he cannot show that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, under the "twice-deferential" standard of review of such claims mandated by the AEDPA, this Court should likewise reject Davis' claim challenging the sufficiency of the evidence.

(b)  *Non-unanimous jury verdict*

Davis argues that the trial court's jury instruction allowing a guilty verdict by less than unanimous vote violated his due process rights.[19] Davis concedes that Louisiana law provides for a ten out of twelve jury verdict where punishment is necessarily confinement at hard labor, as is the case for aggravated rape.[20]  He also acknowledges that the Supreme Court of the

---

[19] Davis represented in his state court pleadings that although the record does not reflect the polling, he was found guilty by a 10-2 verdict.  State Rec., Vol. 5 of 5, Louisiana Supreme Court writ application, No. 2013-0144 (Statement of Case, p. X).

[20] Louisiana Const. art. I, § 17(A); *see also* Louisiana Code of Criminal Procedure article 782 (A), which provides:

>Cases in which punishment may be capital shall be tried by a jury
>of twelve jurors, all of whom must concur to render a verdict.
>Cases in which punishment is necessarily confinement at hard
>labor shall be tried by a jury composed of twelve jurors, ten of

United States has never held that the Sixth and Fourteenth Amendments require a unanimous jury verdict in state criminal prosecutions.[21]  Nonetheless, he urges this Court to set aside the state court's finding that his less than unanimous jury verdict is not constitutionally infirm.

To the extent Davis challenges the state court's determination of the constitutionality of his conviction by a less than unanimous jury vote under state law, the claim fails. Federal *habeas* relief lies only for violations of the "Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (holding that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal *habeas* court).   Any determination by the state appellate court that a unanimity instruction was not required under Louisiana law is binding on this federal *habeas* court.

Nor has Davis demonstrated that the state court's determination was contrary to or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court.  None of the Supreme Court decisions cited by Davis offer any support for his unanimous jury verdict claim.  As noted by the state court on direct appeal,

---

whom must concur to render a verdict. Cases in which the punishment may be confinement at hard labor shall be tried by a jury composed of six jurors, all of whom must concur to render a verdict.

[21] Rec. Doc. 1, Memorandum in Support, p. 9.

many of the cases he cites have nothing to do with the issue.[22]  Moreover, the Supreme Court

"has never held jury unanimity to be a requisite of due process of law" in state criminal trials.

*Johnson v. Louisiana*, 406 U.S. 356, 359 (1972); *see also Apodaca v. Oregon*, 406 U.S. 404 (1972);

*McDonald v. City of Chicago*, 561 U.S. 742, 130 S.Ct. 3020, 3035 n.14 (2010) (noting Court's

holding in *Johnson* that "although the Sixth Amendment right to trial by jury requires a

unanimous jury verdict in federal criminal trials, it does not require a unanimous jury verdict

in state criminal trials.").[23] Davis points to the conflicting opinions in the plurality holding in

---

[22] He includes the same case cites in his federal application as in his state court briefs:
*Jones v. United States*, 526 U.S. 227 (1999); *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Ring v. Arizona*, 536 U.S. 584 (2002); *Blakely v. Washington*, 542 U.S. 296 (2004); *United States v. Booker*, 543 U.S. 220 (2005).  (Rec. Doc. 1, Memorandum in Support, p. 10).  *State v. Davis*, 2011 WL 9160402, at * 5.  None of these decisions address the issue of the constitutionality of a non-unanimous jury verdict.

[23] In *McDonald v. City of Chicago*, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), the Court explained the distinction in light of the ruling in *Apodaca*:

> The Court has held that although the Sixth Amendment right to trial by jury requires a unanimous jury verdict in federal criminal trials, it does not require a unanimous jury verdict in state criminal trials .... In *Apodaca*, eight Justices agreed that the Sixth Amendment applies identically to both the Federal Government and the States. Nonetheless, among those eight, four Justices took the view that the Sixth Amendment does not require unanimous jury verdicts in either federal or state criminal trials, and four other Justices took the view that the Sixth Amendment requires unanimous jury verdicts in federal and state criminal trials. Justice Powell's concurrence in the judgment broke the tie, and he concluded that the Sixth Amendment requires juror unanimity in federal, but not state, cases.

*Id*. at 3035, n. 14 (citations omitted).

*Apodaca* in an attempt to support his argument that the law is unsettled.  Despite his view, however, the holdings in *Apodaca* and *Johnson* remain the established precedent and controlling law.  Under applicable Supreme Court precedent, there is no federal constitutional right to jury unanimity in a state criminal trial.  The Court therefore has no basis for finding that the Louisiana Fourth Circuit's denial of Davis' federal due process claim alleged herein was contrary to or involved an unreasonable application of clearly established Supreme Court law. *See Hoover v. Johnson*, 193 F.3d 366, 369 (5th Cir.1999).  Accordingly, Davis is not entitled to federal *habeas* relief on this claim.

(c)  *Suppression of evidence*

Davis claims that he was denied the opportunity to develop an actual innocence defense because the State withheld the victim's school medical records.  He contends the school records demonstrate that the victim was diagnosed with human papillomavirus (HPV) *prior* to the date she claimed to have been raped by Davis.[24]

---

[24]  The State argues that this claim is unexhausted and technically procedurally defaulted, and alternatively, that it lacks merit. The State contends Davis failed to raise the claim in the context of a *Brady* violation in the state court of appeal.  Instead, in the intermediate state appellate court, Davis cited to *Napue* and argued that the State knew about the school records and the victim's preexisting condition and failed to correct misleading and false testimony at trial.  Even if, arguably, the undisclosed school records were not fully exhausted as the factual basis for a *Brady* claim, the possible procedural default may be overlooked given the somewhat ambiguous border between the two types of claims. *See Banks v. Dretke*, 540 U.S. 668, 690 n. 11, 124 S.Ct. 1256 (2004)(treating as an open question whether *Brady* and *Napue* claims must be separately pleaded and exhausted for *habeas* purposes); *cf.* 28 U.S.C. 2254(b)(2) (*habeas* court may deny relief on the merits even absent exhaustion).

A prosecutor's failure to disclose evidence favorable to the defense constitutes a denial of due process "where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).  A *Brady* analysis includes several factors:  (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued. *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Strickler*, 527 U.S. at 281–82). Evidence is material under *Brady* "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (citing *United States v. Bagley*, 473 U.S. 667, 678 (1985)).

The *Brady* rule only applies to "the discovery, after trial, of information which had been known to the prosecution but unknown to the defense." *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Thus, "when information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of reasonable diligence, the defendant has no *Brady* claim." *United States v. Brown*, 628 F.2d 471, 473 (5th Cir.1980); *Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir.2002) (holding that *Brady* does not require prosecutors to furnish a defendant with exculpatory evidence if that evidence is fully available to the defendant through an exercise of reasonable diligence); *Rector v. Johnson*, 120 F.3d 551, 558–59 (5th Cir.1997) (holding that the State has

no duty to lead the defense toward potentially exculpatory evidence if the defendant possesses the evidence or can discover it through due diligence). *Brady* also does not place any burden upon the prosecution to conduct a defendant's investigation or assist in the presentation of the defense's case. *United States v. Marrero*, 904 F.2d 251, 261 (5th Cir.1990) (citations omitted).

Considering these legal principles, Davis has not shown any violation under *Brady*.[25] The school records were not "suppressed" by the State. Davis has not shown that the school records were even in the State's possession. Moreover, the victim's school records were known to the defense, and in fact, were the basis of argument presented by defense counsel

---

[25] The State in its response presumes that *de novo* review applies to this claim. Although Davis presented a *Brady* claim to the state district court, which issued the last reasoned decision, the state court failed to address the claim. In fact, the district court expressly addressed and rejected the "innocence" aspect of the two-fold factual innocence/*Brady* claim on procedural grounds without mentioning the latter federal issue. When a federal claim has been presented to a state court, and the state court opinion addresses some but not all of defendant's claims, a rebuttable presumption arises on federal *habeas* review that the state court adjudicated the federal claim on the merits and therefore that the ruling is entitled to deference under the AEDPA. *Johnson v. Williams*, 133 S.Ct. 1088, 1096, 185 L.Ed.2d 105 (2013). Whether or not that presumption could be rebutted in this case is unclear and Davis has not addressed the issue. Regardless, out of an abundance of caution, the Court will review the claim *de novo*, for if the claim fails under a *de novo* standard of review, it must also fail under the AEDPA's more deferential standard. *See Berghuis v. Thompkins*, 560 U.S. 370, 388–389, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010) (where a claim fails under *de novo* review, state court's denial of claim must necessarily be found reasonable under the AEDPA's more deferential standard). The Court further notes to the extent that Davis may be attempting to assert factual innocence as a freestanding claim, "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal *habeas* relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir.2000).

at trial.[26]   Defense counsel sought to introduce the school records in connection with the testimony of defense medical expert, Dr. Heard.  The State objected and the parties discussed the issue at length in light of the State's previously filed motion in limine, which sought specifically to restrict introduction of the victim's medical records that predated the incident.[27] The trial court ultimately denied the defense's request for introduction of the school records. There is no suppression under the facts of this case.  The information was known to the defense and acquired as of the time of trial. Accordingly, the *Brady* claim fails.

(d)  *Ineffective assistance of counsel*

Davis argues that he received ineffective assistance of counsel based on his attorney's failure to investigate and discover the victim's school records and then to use those records at trial to establish that the victim's HPV infection existed prior to the date of the alleged rape. He contends the evidence would have established that her rape allegation was false.

The United States Supreme Court has established a two-pronged test for evaluating claims of ineffective assistance of counsel. Specifically, a petitioner seeking relief must demonstrate both that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 697 (1984). A petitioner bears

---

[26] State Rec., Vol. 2 of 5, Defendant's Application for Instanter Subpoena requesting K.R.'s school records for the time period from October 1, 2006 to January 19, 2010; State Rec., Vol. 5 of 5, copies of school records.

[27] State Rec., Vol. 3 of 5, Trial Transcript (May 6, 2010), pp. 141-149.

the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir.1993); *see also Clark v. Johnson*, 227 F.3d 273, 284 (5th Cir.2000). If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong. *Strickland*, 466 U.S. at 697.

To prevail on the deficiency prong of the *Strickland* test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir.2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." *Little v. Johnson*, 162 F.3d 855, 860 (5th Cir.1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. *See Strickland*, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Lockhart v. Fretwell*, 506 U.S. 364, 371 (1993) (quoting *Strickland*, 466 U.S. at 690). A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. *See Crockett v. McCotter*, 796 F.2d 787, 791 (5th Cir.1986); *Mattheson v. King*, 751 F.2d 1432, 1441 (5th Cir.1985).

To prevail on the prejudice prong of the *Strickland* test, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

24

proceeding would have been different." *Strickland*, 466 U.S. at 694. In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*. In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." *Crockett*, 796 F.2d at 793.

Because the state courts rejected petitioner's ineffective assistance of counsel claims on the merits and because such claims present a mixed question of law and fact, this Court must defer to the state court decision unless it was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir.2002). Moreover, the United States Supreme Court has held that, under the AEDPA, federal *habeas corpus* review of ineffective assistance of counsel claims must be doubly deferential. *Woods v. Donald*, 135 S.Ct. 1372, 1376 (2015) (citing *Burt v. Titlow*, 571 U.S. __, 134 S.Ct. 10, 13, 187 L.Ed.2d 348 (2013) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 131 S.Ct. 1388, 1403, 179 L.Ed.2d 557 (2011).

Davis has not shown any deficiency with regard to his attorney's performance before or during trial.  As previously discussed, defense counsel subpoenaed the victim's school records before trial.  Thus, his investigation cannot be deemed inadequate considering he successfully obtained the records at issue.   Nor was his trial performance inadequate. Although ultimately unsuccessful, he vigorously and adequately objected to the State's motion

25

in limine and argued for introduction of the school records at trial.

Furthermore, Davis has not established a reasonable probability that, but for defense counsel's failure to introduce the victim's school records, the result would have been any different. Davis argues that had counsel established that Davis did not transmit the HPV virus to the victim, by showing that she already had the virus before the alleged rape, he would not have been convicted. While it appears the defense sought to introduce the school records in order to imply that her infection was preexisting and cast doubt on her credibility, the school records themselves do not reflect any prior diagnosis of HPV. The school records contain largely generalized medical complaints by the victim such as sore throat, vomiting, and stomach pain. However, no medical expert testified at trial that these symptoms were associated with HPV. In fact, Dr. Atzemis expressly testified that nausea and vomiting were not symptoms or indicators of HPV.[28] Although one notation involving genital warts was made in the school record, it was dated November 2007, the same month that the victim was examined by Dr. Atzemis and one month *after* the victim was raped. The records simply do not establish that the victim contracted the HPV infection prior to the date of the rape, as Davis suggests. Moreover, even if Davis could have established that the victim had a preexisting HPV infection, this would not prove that Davis did not rape the victim on October 5, 2007. Davis has not demonstrated any prejudice.

---

[28] State Rec., Vol. 2 of 5, Trial Transcript (May 5, 2010), p. 71.

Under the doubly deferential standards mandated by the AEDPA, there is no basis for this Court to find that the state court's decision denying Davis' ineffective assistance of counsel claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

## RECOMMENDATION

**IT IS RECOMMENDED** that Davis' application for federal *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir.1996) (en banc).[29]

New Orleans, Louisiana, this 5th day of August, 2015.

_____
**MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE**

---

[29] *Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.

27